EFFIE DELLA HAMILTON CARLSON et al., Appellees, v. REBECCA ANN HAMILTON et al., Appellants.

No. 43253.

MARCH 17, 1936.

Mahoney & Mackey, for appellants.

530

L. S. Nelson, Willis Barber, and F. Hollingsworth, for appellees.

HAMILTON, J.—John Hamilton, late of Boone county, Iowa, was the owner of 120 acres of land located in said county, upon which he and his wife, Rebecca Ann, and an unmarried adult son, L. J. Hamilton, resided at the time of John's death in 1914. There were two other children, Mrs. Carlson and Mrs. Moss, plaintiffs and appellees herein. After the father's death, the children had a mutual understanding, in which the mother acquiesced, whereby the son, who during his entire lifetime had resided on this one farm, should have the farm at an agreed price of $160 per acre, and the two girls should have their share in money, the mother to have the use, rents, and profits from the 40 acres constituting the homestead as long as she lived, and the payment of the girls' share in the purchase price of the homestead 40 was to be deferred until after the mother's death. The testimony of the parties in reference to this matter as to the homestead 40 is not in entire accord, but we think the entire record bears out the above statement. Accordingly, the mother and daughters conveyed the 80 other than the homestead to the son, and he in turn paid each of the girls in cash her one-third in the purchase price of the 80. At the same time the children all joined in conveying the fee-simple title to the homestead 40 to the mother.

On April 20, 1915, the mother deeded the homestead 40 to the son, in consideration of $1.00 and love and affection; the deed containing the following proviso:

"Subject to the payment to my daughter, Effie Della Hamilton Carlson and to my daughter, Pearl Maud Hamilton Moss, each, the sum of $2,133.33 on or before 5 years after my decease. Said sums to draw 5% per annum int. from my death, payable annually. Reserving to myself the use, occupancy and control of said premises during my natural life."

This deed was delivered to the son, and for a time kept in a box referred to as the "son's box" but to which the mother had access. A few years later, with the mother's knowledge and consent, the son placed the deed of record. The son continued to reside upon this place, paying the mother rent for the 40. It clearly appears from the record that this deed was under-

stood and intended to be just as its terms express at the time it was executed, and no question was raised about it until the financial depression began to squeeze the value out of this land. The son's own testimony shows this. He said: "The way we prepared it, it was all right at the time. It was about four or five years back, I should say, when my mother and I *decided* it wasn't right." Likewise the mother testified: "Mr. Snell drew up the deed and asked me if it was all right at that time, and I said yes." The evidence shows the farm as a whole was at the time worth the purchase price paid by the son of $160 per acre. The son was a willing purchaser. He was 46 years of age and says: "I had always wanted the farm." All through the period of inflated or boom prices, when this land was worth double what the son paid for it, there was not a murmur of discontent from any one about this deal, not even from the girls, although at that time it would appear that the son had made a large profit on his investment. In 1934 the mother, who was 87 years of age, said she "thought" it was not fair to the son, and she asked the girls to make things right. The girls in substance said they did not complain when the land went to $400 per acre and the brother ought to stand by his bargain, and they refused to do anything about it. Thereupon the son and his wife deeded the 40 back to the mother, and the mother in turn on the same day, to wit, August 6, 1934, deeded it back to the son, reducing the cash payment to each of the girls from $2,133.33 to $800, this deed reciting that the $800 provision was in lieu of the $2,133.33, and that the former deed was canceled and annulled.

■■■ On the 7th of November, 1934, this action was commenced to cancel and set aside these last two deeds and for injunctive relief against disturbance of alleged vested rights in the plaintiffs by virtue of the former deed executed April 20, 1915, and for general equitable relief. The trial court found, and rightly so, that the deed executed by the mother to the son on April 20, 1915 created a valid charge in favor of the plaintiffs against the land therein described, in the sum of $2,133.33 each, payable on or before five years after the death of the mother, and that the latter deeds should be canceled and set aside. This was not a testamentary disposition of this 40 acres to take effect only at the death of the mother, coupled with a burden upon the donee which he was at liberty to accept or reject after the death of the mother. This was an out and out conveyance of the title

in præsenti to the son, made in accordance with a previous plan and understanding between all the parties that the son was to have the farm at a fixed price, the girls to have theirs in cash on the same basis as to value. This deed was accepted and retained by the son for 19 years, and was beyond the power of the mother to recall as against the son, and was therefore binding upon the son to carry out the burden cast upon him in favor of his sisters, and was a charge upon the land. Schrader v. Schrader, 158 Iowa 85, 139 N. W. 160; In re Estate of Phearman, 211 Iowa 1137, 232 N. W. 826, 82 A. L. R. 674. Not that the mother was under legal obligations to make the conveyance in the way and manner arranged by the children, but the fact that there had been this understanding and that this deed was in accordance with such plan has a vital bearing on what the mother intended and as to how the son understood it to be when he accepted the deed.

■■■ The mother, in executing this last deed to the son, attempted to treat the former deed as testamentary, saying that she "believed" that she had a right to do this, and by executing this second deed to the son reduce the amount which she had previously given to the daughters as she would and could do by way of codicil to a will. The record clearly shows, and one cannot read the same without coming to the conclusion, that this was an afterthought on the part of the son and the aged mother to change a completed transaction which had turned out to be burdensome to the son into one more favorable to the son. It should be noticed that the mother's interests are in no way affected by the execution of the latter deed. Much stress is laid upon the alleged fact that the girls were not consulted and had no knowledge of the provisions in their behalf contained in this first deed. We do not believe the record will bear out this contention. However, it seems to be the rule quite generally expressed by the courts that a conveyance of this character made upon the condition that the grantee shall pay a specified sum of money to a third person, the acceptance of the conveyance by the grantee which includes such a clause creates a covenant on the part of the grantee to discharge the obligation imposed, and creates the relation of trustee and cestui que trust between the grantee and the persons for whose benefit the payment is to be made, *without any act or assent on the part of the beneficiary.* Koch v. Streuter, 232 Ill. 594, 83 N. E. 1072, at page 1075. In

the case of Rodgers v. Reinking, 205 Iowa 1311, at page 1319, 217 N. W. 441, 444, we find this language: "It was unnecessary that George [the donee] assent to the contract, or that he have knowledge of its existence."

We are abidingly satisfied that the trial court reached the correct conclusion, and that the case should be, and is, affirmed. —Affirmed.

DONEGAN, C. J., and ALBERT, KINTZINGER, ANDERSON, RICHARDS, PARSONS, and STIGER, JJ., concur.